**Mona HARVEY, Plaintiff,**

v.

**CHEVRON U.S.A., INC., d/b/a Chevron U.S.A. Production Company, Defendant.**

**Civ. A. No. H–95–3779.**

United States District Court, S.D. Texas.

April 23, 1997.

Fritz Barnett, Barnett & Craddock, L.L.P., Houston, TX, for plaintiff.

Holly H. Williamson and Stewart Hoffer, Littler, Mendelson, Fastiff, Tichy & Mathiason, Houston, TX, for defendant.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendant Chevron U.S.A., Inc. d/b/a Chevron U.S.A. Production Company's ("Chevron") Motion for Summary Judgment (# 35). Chevron seeks summary judgment on Plaintiff Mona Harvey's ("Harvey") claims alleging gender discrimination, sexual harassment, and retaliation. Having reviewed the motion, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that Chevron's motion should be granted.

I. *Background*

Harvey, an attorney, began her employment with Chevron on January 4, 1982, as a land representative in the Contract and Lease Maintenance Division of Chevron's Land Business Unit in New Orleans, Louisiana. While working as a land representative from 1982 until 1987, Harvey's immediate supervisor was Walter Heuer ("Heuer"), who in turn, reported to Edward J. Guise ("Guise"), the Manager of Lease Maintenance.

In 1985, Harvey began requesting a transfer to "Division" because the jobs allegedly entailed more responsibility, exposure, marketability, and opportunity. Harvey claims that for two years, from 1985 to 1987, she remained in Property Administration, while others were being shifted around the Land Department. In 1987, Harvey informed Guise that she would go to the Equal Em-

ployment Opportunity Commission ("EEOC") if she was not transferred into Division. Guise directed her to his supervisor, Howard Dearing ("Dearing"). Harvey spoke with Dearing about why she had not been moved to Division. Subsequently, in late 1987 or early 1988, Harvey was assigned to the Onshore Division as a land representative.

In 1990, Chevron reorganized its Land Business Unit and consolidated all property administration functions that were being performed in New Orleans, Houston, and San Ramon, California, into a new Property Administration Group located in Houston. This reorganization did not involve Harvey's position with the Onshore Division in New Orleans. Rather, the reorganization affected the Contract and Lease Maintenance Group from which Harvey had voluntarily transferred in 1987. Hence, Harvey was not automatically entitled to a transfer to Houston. Due to her desire to return to her home state of Texas, however, Harvey requested that she be permitted to rejoin the Contract and Lease Maintenance Group so that she could be transferred to Houston.[1] The transfer, a voluntary demotion, was approved.

In August 1990, the Contract and Lease Maintenance Group transferred to Houston and was thereafter known as the Property Administration Group. Guise became the Manager of Property Administration and transferred to Houston, as well. Harvey offered to stay and finish a project in New Orleans; thus, her transfer to Houston was delayed until December 1990. In Houston, Harvey's immediate supervisor was Rebecca Wagstaff ("Wagstaff"), who reported to Guise.

Within a few months of Harvey's arrival in Houston, she began expressing dissatisfaction with her job, complaining that her work was too clerical. According to Chevron, it was during this time period that Harvey reported to Wagstaff that Guise was demonstrating work-related favoritism toward Col-

leen Naff ("Naff"), an employee in another unit of the Property Administration Group. Naff's immediate supervisor was Heuer, who in turn, reported to Guise. In April 1991, Harvey reported to Wagstaff that Guise gave Naff high profile assignments, a lighter workload, and special perquisites, such as work-related trips out of town. Harvey requested, however, that Wagstaff keep this information confidential. Wagstaff complied with Harvey's request and never told anyone about Harvey's report. Therefore, no formal complaint was ever made against Guise as a result of Harvey's allegations. In July 1991, Harvey again reported to Wagstaff that she felt her career was being harmed because of special treatment being given to Naff by Guise. Harvey, however, did not request, nor did Wagstaff file, a formal complaint against Guise.

In October and November 1991, Chevron formed a separate legal department for the Upstream Production Division.[2] The formation of this separate legal department, the Upstream Law Unit, created some new openings in the Legal Department for attorneys who were members of the Land Business Unit. On January 1, 1992, Guise transferred to the Law Unit, and Chevron promoted Wagstaff to replace Guise as the Manager of Property Administration. Carl Rewerts ("Rewerts") was selected to fill Wagstaff's former position. Thus, Rewerts became Harvey's direct supervisor and Wagstaff her indirect supervisor.

Because some of its mineral properties had been sold, Chevron reduced its workforce in August 1992. The company-wide reduction-in-force became effective on August 31, 1992. During the reduction-in-force, Chevron reduced its workforce from 8,117 employees to 5,899 employees—a 27% decrease. Chevron terminated Harvey's employment as part of the reduction-in-force. After the 1992 reduction-in-force, 126 employees remained in the Land Business Unit, a reduction of approximately 55%. Harvey's assigned section of

---

1. Chevron did not hire attorneys for its Property Administration offices outside of New Orleans. These positions were typically rated as non-exempt and non-professional positions.

2. In the oil and gas industry, the term "upstream" means the exploration and production of petroleum, as opposed to "downstream," which refers to the transportation, refining, and marketing aspects of the finished products.

the Land Business Unit, the Property Administration Group, was reduced from over fifty employees to less than twenty. Before the reduction-in-force, the Property Administration Group had 22 land representatives, fourteen of whom were females and eight were males. After the reduction-in-force, of the seven persons occupying positions similar to that Harvey had held, six were female and one was male. Property Administration suffered a 65% reduction. The only person in Harvey's immediate work group to survive the 1992 reduction-in-force was Debra Wright, a female. In April 1996, Chevron further reduced its workforce to 5,126 employees. After the April 1996 reduction, the Land Business Unit was further reduced in size to only 96 employees.

On September 3, 1992, Harvey filed a charge of discrimination with the EEOC and the Texas Commission on Human Rights, alleging claims of sexual harassment and sexual discrimination. She filed this action in the 269th Judicial District Court of Harris County, Texas, on May 30, 1995, and the defendants subsequently removed it to this court. In her original petition, Harvey brought claims against Chevron and Guise, alleging sexual discrimination and sexual harassment under the Texas Commission on Human Rights Act, intentional infliction of emotional distress, and negligent hiring, retention, and supervision.

By order dated September 29, 1995, Harvey's claims against Guise were dismissed. On December 22, 1995, Harvey sought leave to amend her complaint to add a cause of action under Title VII of the Civil Rights Act of 1964, as amended. On January 23, 1996, this court issued its Memorandum and Order granting summary judgment on Harvey's state law claims, as they were barred by the applicable statutes of limitation. Harvey was granted leave to file an amended complaint setting forth her Title VII claim on February 13, 1996.

II. *Analysis*

A. *The Standard for Summary Judgment*

Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams,* 836 F.2d 958, 960 (5th Cir.1988). The moving party, however, need not negate the elements of the non-movant's case. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994).

Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1069, 1075. The controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party. *See Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 402 n. 5, 112 L.Ed.2d 349 (1990); *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Judwin Properties, Inc. v. United States Fire Ins. Co.,* 973 F.2d 432, 435 (5th Cir.1992). Nevertheless, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *See Douglass v. United Services Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. Summary judgment is mandated if the non-movant fails

to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552. "In such situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552.

### B. *Sex Discrimination*

Although Harvey has not asserted a specific cause of action in her amended complaint for gender-based discrimination unrelated to sexual harassment, she made several allegations in her amended complaint and alluded during her deposition to events that could be viewed as sexual discrimination. Therefore, these claims must be analyzed in the context of gender discrimination unrelated to sexual harassment.

#### 1. *Statute of Limitations*

In Texas, to sustain a Title VII claim, a plaintiff must file her charge of discrimination within 300 days of the "alleged unlawful employment practice." *See* 42 U.S.C. § 2000e–5(e); *Anson v. University of Tex. Health Science Ctr.*, 962 F.2d 539, 540 (5th Cir.1992). Generally, the limitations period begins on the date the discriminatory act occurred, and a plaintiff cannot sustain her claims based on incidents occurring before the 300–day period. *Waltman v. International Paper*, 875 F.2d 468, 474 (5th Cir. 1989). Any act occurring outside the applicable filing period "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1888, 52 L.Ed.2d 571 (1977); *see Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 434 n. 12 (5th Cir.1995); *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 199 (5th Cir.1992); *Merrill v. Southern Methodist Univ.*, 806 F.2d 600, 604 n. 5 (5th Cir.1986); *Downey v. Southern Natural Gas Co.*, 649 F.2d 302, 305 (5th Cir.1981).

The courts, however, have recognized an equitable exception "where the unlawful employment practice manifests itself over time, rather than as a series of discrete acts." *Waltman*, 875 F.2d at 474; *Abrams v. Baylor College of Med.*, 805 F.2d 528, 532 (5th Cir.1986). In order to extend the statute of limitations period under this exception, known as a continuing violation, the plaintiff must file an EEOC charge within at least 300 days of one of the alleged acts of discrimination. *See Waltman*, 875 F.2d at 474; *see also Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980). A continuing violation tolls the statute of limitations because such statutes are meant only to prevent stale claims. *See McGregor v. Louisiana State Univ. Bd. of Supervisors*, 3 F.3d 850, 867 (5th Cir.1993), *cert. denied*, 510 U.S. 1131, 114 S.Ct. 1103, 127 L.Ed.2d 415 (1994) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380, 102 S.Ct. 1114, 1125, 71 L.Ed.2d 214 (1982)). "'Where the challenged violation is a continuing one, the staleness concern disappears.'" *Id.* Nevertheless, the "case law on the subject of continuing violations is inconsistent and confusing." *Glass v. Petro–Tex Chem. Corp.*, 757 F.2d 1554, 1560 (5th Cir. 1985). The Fifth Circuit has cautioned that "[t]his theory of continuing violation has to be guardedly employed because within it are the seeds of destruction of the statute of limitation in Title VII cases." *Abrams*, 805 F.2d at 533.

If none of the alleged acts occurred within 300 days of the filing of the EEOC charge, however, the plaintiff's cause of action for employment discrimination is time-barred. *See Delaware State College*, 449 U.S. at 258, 101 S.Ct. at 504; *Waltman*, 875 F.2d at 474–75; *Abrams*, 805 F.2d at 533. Here, it is undisputed that Harvey did not file an EEOC charge within 300 days after the first incident of purported discrimination. At her deposition, Harvey testified that she believed Chevron discriminated against her as far back as 1985. Specifically, Harvey was asked, "You say that you believe between the period 1985 and 1987 you were discriminated against on the basis of your sex because you wanted a transfer into division and until 1987 you were denied that wish or desire. Cor-

rect?" Harvey responded, "Yes, ma'am." In addition, Harvey was questioned whether "it's fair to say that as of 1990 when you left the on shore division and moved to Houston, you had a belief that you, as a female, were being discriminated against on the basis of your sex. Correct?" Again, Harvey answered, "Yes, ma'am." Further, although Harvey visited the EEOC in February 1992, she did not file a charge of discrimination at that time. Instead, she waited until September 3, 1992, to file a charge. Therefore, unless a continuing violation is established, Harvey may only recover for conduct that occurred on or after November 5, 1991, 300 days before September 3, 1992.

The Fifth Circuit has adopted a multifactor test to determine the existence of a continuing violation. *See Berry v. Board of Supervisors,* 715 F.2d 971, 981 (5th Cir.1983), *cert. denied,* 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986). These factors include subject matter, frequency, and permanence.

> This inquiry, of necessity, turns on the facts and context of each particular case. Relevant to the determination are the following three factors, which we discuss, but by no means consider to be exhaustive. The first is subject matter. Do the alleged facts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence which should trigger an employee's awareness and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Id.* "The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect h[er] rights." *Glass,* 757 F.2d at 1561 (citations omitted); *see also Abrams,* 805 F.2d at 534.

In analyzing the permanence factor, the court examines whether a discrete event triggered a duty of the plaintiff to assert her rights. *See Waltman,* 875 F.2d at 476. Basically, permanence is an inquiry into what the plaintiff knew or should have known at the time of the discriminatory act. *See Sabree v. United Bhd. of Carpenters & Joiners,* 921 F.2d 396, 402 (1st Cir.1990). If a plaintiff knows or with the exercise of reasonable diligence would have known that she suffered from discrimination, she "may not sit back and accumulate all the discriminatory acts and sue on all within the statutory period applicable to the last one." *Moskowitz v. Trustees of Purdue Univ.,* 5 F.3d 279, 282 (7th Cir.1993); *see Kolnicki v. Ford Motor Co.,* No. 94 C 7573, 1995 WL 431185, at *7 (N.D.Ill. July 17, 1995); *Reed v. Chemlink, Inc.,* No. 90–3942, 1991 WL 161475, at *4 (E.D.La. Aug.8, 1991). Thus, as the First Circuit noted:

> A knowing plaintiff has an obligation to file promptly or lose his claim. This can be distinguished from a plaintiff who is unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern.

*Sabree,* 921 F.2d at 402; *Martin v. Frank,* 788 F.Supp. 821, 826 (D.Del.1992).

The Fifth Circuit has recognized that "[a]cts of harassment that create an offensive or hostile work environment generally do not have the same degree of permanence as, for example, the loss of promotion." *Waltman,* 875 F.2d at 476; *see West v. Philadelphia Elec. Co.,* 45 F.3d 744, 755–56 (3d Cir.1995). In the latter example, there is an element of permanence to the discriminatory action that should, in most cases, alert a plaintiff that his rights have been violated. *See Stair v. Lehigh Valley Carpenters Local Union No. 600,* 813 F.Supp. 1112, 1116 (E.D.Pa.1993).

In the case at bar, Harvey does not assert the continuing violation theory in order to toll the applicable statute of limitations. If Harvey had raised such an argument, however, it would be precluded by her admission that she has always believed Chevron's conduct to be discriminatory. At deposition, Harvey testified that she believed that as far back as 1985 Chevron had discriminated against her. It was in 1985 that Harvey began requesting a transfer to Division,

which was ultimately approved in 1987. The delayed promotion or transfer to Harvey is "more in the nature of an ... isolated ... employment decision" which does not warrant a continuing violation exception. *See Berry,* 715 F.2d at 981. With respect to the third *Berry* requirement—degree of permanence—it appears that the delay of the promotion or transfer to Division is properly viewed as a permanent action, *i.e.,* of the type that "should trigger an employee's awareness and duty to assert h[er] rights and ... should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate." *Id.; see also Waltman,* 875 F.2d at 475. Accordingly, any claim for non-harassment-related gender discrimination based on events occurring prior to November 1, 1991, is time-barred.

### 2. *Burden of Proof*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

In *McDonnell Douglas* and *Burdine,* the United States Supreme Court outlined the burden-shifting framework generally applicable in employment discrimination cases. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Where, as here, there is no direct evidence of discrimination, a plaintiff must initially establish a *prima facie* case by satisfying a four-element test from which discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *See Wallace,* 80 F.3d at 1047 (citing *Meinecke v. H & R Block of Houston,* 66 F.3d 77, 83 (5th Cir.1995)); *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1087 (5th Cir.1994) (citing *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94). Once the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to articulate—but not prove—a legitimate, nondiscriminatory reason for its employment decision. *See McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824; *Davis,* 14 F.3d at 1087; *see also Marcantel v. Department of Transp. & Dev.,* 37 F.3d 197, 199 (5th Cir.1994). If the employer meets its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish that the reason proffered by the employer is merely a pretext for discrimination. *See McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824; *Marcantel,* 37 F.3d at 200; *Moham v. Steego Corp.,* 3 F.3d 873, 875 (5th Cir.1993), *cert. denied,* 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). To demonstrate a "pretext for discrimination," the plaintiff must show both that the employer's proffered reason was false and that discrimination was the real reason. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 2751–52, 125 L.Ed.2d 407 (1993). At all times, however, the plaintiff has the ultimate burden to prove intentional discrimination. *See id.* at 507, 113 S.Ct. at 2747; *Marcantel,* 37 F.3d at 200.

The Fifth Circuit has formulated the plaintiff's burden under *St. Mary's Honor Ctr.* as one of establishing that the employer's nondiscriminatory reason is not credible and that an unlawful discriminatory intent motivated the employer's action. *See Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1249 (5th Cir.1995). "Under *Hicks,* '[i]t is not enough, in other words, to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.' " *Id.* (quoting *St. Mary's Honor Ctr.,* 509 U.S. at 519, 113 S.Ct. at 2754). "The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1091 (5th Cir. 1995); *accord Odom v. Frank,* 3 F.3d 839, 850 (5th Cir.1993); *Little v. Republic Ref. Co.,* 924 F.2d 93, 97 (5th Cir.1991). In the context of a motion for summary judgment, "[a] jury issue will be presented and a plaintiff can avoid summary judgment ... if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's

stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [plaintiff's protected status] was a determinative factor in the actions of which the plaintiff complains." *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996). The burden-shifting approach may be dispensed with altogether, however, if the plaintiff is able to establish intentional discrimination by direct evidence of discriminatory motive. *See Wallace,* 80 F.3d at 1047–48; *Kendall v. Block,* 821 F.2d 1142, 1145 (5th Cir.1987); *Ramirez v. Sloss,* 615 F.2d 163, 168 (5th Cir.1980).

Nevertheless, an employee's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for judicial relief. *See, e.g., Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 42 (5th Cir.1996); *Douglass,* 79 F.3d at 1429; *Ray,* 63 F.3d at 434; *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 152–53 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996); *EEOC v. Louisiana Office of Community Servs.,* 47 F.3d 1438, 1448 (5th Cir.1995); *Portis v. First Nat'l Bank of New Albany,* 34 F.3d 325, 329 (5th Cir.1994); *Grizzle v. Travelers Health Network, Inc.,* 14 F.3d 261, 268 (5th Cir.1994); *Molnar v. Ebasco Constructors, Inc.,* 986 F.2d 115, 119 (5th Cir.1993); *Republic Ref. Co.,* 924 F.2d at 96. Although Title VII protects employees against discrimination in the terms and conditions of employment, it does not afford minorities special preference or place upon the employer an affirmative duty to accord them special treatment. *See* 42 U.S.C. § 2000e–2(j); *see also Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096–97; *Sessions v. Rusk State Hosp.,* 648 F.2d 1066, 1071 (5th Cir. 1981); *Wynn v. Columbus Mun. Separate Sch. Dist.,* 692 F.Supp. 672, 684 (N.D.Miss. 1988). Furthermore, the employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of business decisions, nor . . . to transform the courts into personnel managers." *Louisiana Office of Community Servs.,* 47 F.3d at 1448 (citing *Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1507–08 (5th Cir.1988)); *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 959 (5th Cir.1993); *see also Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978); *Waggoner v. City of Garland,* 987 F.2d 1160, 1165 (5th Cir.1993); *Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 647 (5th Cir.1985).

### 3. *Harvey's Claims*

#### a. *Failure to Promote/Transfer*

■ Harvey asserts that Chevron discriminated against her after she arrived in Houston and began working in the Property Administration Group. Harvey complained to management that her position was too clerical and Chevron should have transferred her to "Division." Specifically, in ¶ 8 of her amended complaint, Harvey alleges, "While she was denied such transfers, male counterparts were hired from outside the company and were granted such lucrative positions."

In order to establish a *prima facie* case of failure to promote under Title VII, a plaintiff must show that:

1. she is a member of a protected group;

2. she applied for a position for which she was qualified;

3. she was rejected; and

4. after she was rejected, the employer promoted or continued to seek other candidates not in the protected group.

*See Uviedo v. Steves Sash & Door Co.,* 738 F.2d 1425, 1428 (5th Cir.1984), *cert. denied,* 474 U.S. 1054, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986) (citing *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824); *Page v. United States Indus., Inc.,* 726 F.2d 1038, 1055 (5th Cir.1984); *see also Lindsey v. Prive Corp.,* 987 F.2d 324, 326–27 (5th Cir.1993).

Here, Harvey meets the first *prima facie* element because, as a woman, she is a member of a protected class under Title VII. With respect the second element, Harvey voluntarily requested to be transferred to Property Administration, a demotion, in order to effectuate her desire to relocate to Houston. Harvey admitted at deposition, however, that the transfer to Houston required a commitment to remain in Property Administration at least twelve months. Specifically, Harvey testified:

Q: Do you remember telling Mr. Guise that you would commit to remaining in the property administration group for at least 12 months before you began posting?

A: That sounds reasonable. I don't—I don't remember if I committed that or not, but I think that would have been the expectation.

Q: And it's your recollection, however, that you did not wait 12 months to begin posting for positions outside of the property administration group. Correct?

A: I don't remember when I first posted.

Moreover, Harvey has failed to identify any position to which she should have been transferred that was awarded instead to a less-qualified male. Thus, Harvey has failed to establish a *prima facie* case of sex discrimination on the basis of Chevron's failure to promote or transfer her to another position.

### b. *Discriminatory Discharge*

■ Also, in ¶ 8 of her first amended complaint, Harvey maintains that in connection with the 1992 reduction-in-force, "Less senior and less experienced males were permitted to keep their jobs, were promoted or were transferred into other departments with Defendant."

Traditionally, to establish a *prima facie* case of discriminatory discharge, Harvey must show:

1. she is a member of a protected group;

2. she was qualified for the position in question;

3. she was discharged from the position; and

4. she was replaced by someone outside the protected group.

*See St. Mary's Honor Ctr.,* 509 U.S. at 506–07, 113 S.Ct. at 2746–47; *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824; *Meinecke,* 66 F.3d at 83; *Singh v. Shoney's, Inc.,* 64 F.3d 217, 219 (5th Cir. 1995); *Marcantel,* 37 F.3d at 200; *Portis,* 34 F.3d at 328 n. 6. Alternatively, Harvey may establish a *prima facie* case by showing that she is a member of a protected class, she was qualified for the position, and persons outside of the class were treated more favorably than she. *See Nieto v. L & H Packing Co.,* 108 F.3d 621, 623 n. 5 (5th Cir.1997); *Waggoner,* 987 F.2d at 1163; *Johnson v. Chapel Hill Indep. Sch. Dist.,* 853 F.2d 375, 381 (5th Cir.1988); *Thornbrough,* 760 F.2d at 639.

"The Supreme Court has stressed that the *McDonnell* test was not intended to be a rigid or ritualistic test of disparate treatment." *Carter v. City of Miami,* 870 F.2d 578, 583 n. 12 (11th Cir.1989) (citing *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983)). Because discrimination exists " 'in forms as myriad as the creative perverseness of human beings can provide,' certain specific elements do not constitute 'the alpha and omega' " of a *prima facie* case. *Thornbrough,* 760 F.2d at 642 (quoting *McCorstin v. United States Steel Corp.,* 621 F.2d 749, 753–54 (5th Cir.1980)); *see Marshall v. Goodyear Tire & Rubber Co.,* 554 F.2d 730, 735 (5th Cir.1977). Therefore, the Fifth Circuit has modified the *McDonnell Douglas* test in the context of cases that involve a general reduction in the employer's workforce. *See Amburgey v. Corhart Refractories Corp., Inc.,* 936 F.2d 805, 812 (5th Cir.1991); *Thornbrough,* 760 F.2d at 642; *Williams v. General Motors Corp.,* 656 F.2d 120, 127–28 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). Reduction-in-force cases are outside the embrace of *McDonnell Douglas,* as reduction-case plaintiffs are simply laid off and thus are incapable of proving the fourth *McDonnell Douglas* prong, *i.e.,* actual replacement by someone outside the protected group. *See Thornbrough,* 760 F.2d at 642. Thus, in situations such as this, where the employer reduces its workforce and does not replace the discharged employee, the fourth prong of the *prima facie* case is altered to require the plaintiff to produce "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Williams,* 656 F.2d at 129.

Hence, in order to establish a *prima facie* case of discrimination in a reduction-in-force case, the plaintiff must show:

1. she was within a protected group;
2. she was adversely affected by the employer's decision;
3. she was qualified to assume another position; and
4. that males remained in similar positions after she was discharged.

See *Meinecke*, 66 F.3d at 84; *see also Nichols*, 81 F.3d at 41 (citing *Amburgey*, 936 F.2d at 812); *Thornbrough*, 760 F.2d at 642; *Molnar*, 986 F.2d at 119; *Resare v. Raytheon Co.*, 981 F.2d 32, 41–42 (1st Cir.1992); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1532 n. 14 (11th Cir.1987); *Williams*, 656 F.2d at 129; *see generally Sale v. Philip Morris, USA*, 81 F.3d 151, 1996 WL 128415, at *1 (4th Cir. Mar.21, 1996); *Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 567–68 (11th Cir.1992).

By virtue of her being a woman, Harvey has satisfied the first element of a *prima facie* case. Harvey also has established the second and third elements, as she was qualified to serve in the Property Administration Group and was laid off from that position. Finally, with regard to the fourth element, Harvey has demonstrated that a male remained in a similar position after she was discharged. After the reduction-in-force, of the seven persons selected to remain in a position comparable to the one Harvey held, six were female and one was male.

■ Without regard to Harvey's ability to establish a *prima facie* case of discrimination, however, Chevron has articulated a legitimate, nondiscriminatory reason for Harvey's termination—a company-wide reduction-in-force. Chevron maintains that Harvey was included in the layoff due to the low ranking given her by her supervisor, Wagstaff, after consultation with the four supervisors in the Property Administration Group. The unrefuted evidence

shows that the ranking criteria focused on the skills, job knowledge, and experience of all of the employees in the unit. The final authority for employment decisions rested with the Personnel Development Committee ("PDC") as a group, with no one member's opinion being weighted more heavily than another.[3] After open discussion about the individual manager's assessment of each employee under consideration, the PDC selected the employees who would be retained. Harvey was selected for inclusion in the reduction-in-force when she was evaluated under these criteria and found to have exhibited poor work performance and difficulty in working with others.

As the Manager of the Property Administration Section, Wagstaff, after consultation with the four supervisors in the Property Administration Group, completed the candidate selection form for Harvey, evaluating her under the Skills Required section, as follows:

| | |
|---|---|
| (1) Business Focus | Low |
| (2) Productivity/Work Output | Low |
| (3) Analytical Skills | Fair |
| (4) Communication | Fair |
| (5) Coaching | Low |
| (6) Working With Others | Low |
| (7) Innovation/Adaptability to Change | Good |

Under the Job Knowledge and Experience Required section, she received four "Medium" and one "Low" rating. The individuals who were selected for the positions each received several "High" and no "Low" ratings. Specifically, the one male who was chosen to remain, Frank Massa ("Massa"), received three "Strength," two "Good," and one "Fair" rating on the Skills Required section. With respect to Massa's ratings under the Job Knowledge and Experience section, he received all "High" ratings.

Harvey's Demonstrated Skills Evaluation identified Harvey's "Ratings and Traits." The meeting participants for this evaluation of Harvey, identified by their initials at the bottom of the evaluation, included supervisors in Property Administration—Carol A. Quartana, Daniel White, Rewerts, Betty Par-

---

**3.** The Land Business Unit PDC was a committee comprised of managers from each section of the Land Business Unit. At the time, the PDC consisted of C. Burr Branstetter ("Branstetter"), Wagstaff, Gordon Cain ("Cain"), Orville Baldwin

("Baldwin"), Donn Wilson ("Wilson"), Rick Hughes ("Hughes"), Dave Messer ("Messer"), Margo Bart ("Bart"), and Benny Dumas ("Dumas").

ker, and Wagstaff. The Demonstrated Skills Evaluation of Harvey prepared by the group of Property Administration supervisors was sent to the PDC. Under "Business Focus," comments about Harvey included: "[d]oesn't put co. goals doesn't [sic]. Has her own agenda. Has allowed significant backlog to develop & did not work to reduce when asked." The comments under "Productivity/Work Output" provided: "Allowed significant backlog to develop. Doesn't always do the work right the first time." The notations describing Harvey's "Analytical Skills" stated: "Doesn't always fit logical pieces together well. Misses some concepts. Avoided dealing with SI rpt. when she didn't know what to do—Usually analytical skills O.K.—Just doesn't try." Harvey's written communication skills were described as good. With respect to her oral communication skills, however, the notation was made that Harvey "Lacks tact at time—Not a positive tone." Under the category "Coaching," Harvey was described as: "Not very coachable—Doesn't take constructive criticism well. With newsletter, has coached others—Doesn't delegate effectively." With regard to "Working with Others," comments about Harvey included: "Has coordinated team efforts on newsletter—Not a friendly person & stirs up unrest in group." Finally, as for Harvey's "Innovation/Adaptability to Change," notations stated: "Can be innovative and has come up with good ideas on how to better utilize Land Asst., job notification system, etc. Doesn't adapt as well to new ideas of others & mgmt. Creative on newsletter." Wagstaff stated in her affidavit that through her supervision of Harvey, she concluded that Harvey:

(1) lacked teamwork skills;

(2) failed to support management's objectives;

(3) developed a backlog of work that Wagstaff attributed to the amount of time spent working on the Land Business Unit newsletter;

(4) on repeated occasions, exhibited a challenging and confrontational method of dealing with other employees and management; and

(5) possessed average analytical skills in addition to her overall work performance being rated merely "average."

In her response to Chevron's motion for summary judgment, Harvey does not address her gender discrimination claim. Instead, in Harvey's supplemental response, she concedes that, after being provided with statistical information regarding the gender impact of Chevron's 1992 workforce reduction on the Land Business Unit, she "cannot determine whether gender played a role and if so to what degree in the layoff which occurred in the layoff of 1992." In its reply brief, Chevron notes that the statistics demonstrate that the 1992 reduction-in-force impacted a slightly higher percentage of male Land Business Unit employees than females. Specifically, 55% of the male employees in the Land Business Unit were laid off or were transferred to another division as compared to 45% of the females. Of the sixty-seven Land Business Unit employees who did not remain with Chevron in any capacity, 52.2% were male and 47.8% were female.

As noted above, the employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of business decisions, nor ... to transform the courts into personnel managers." *Louisiana Office of Community Servs.*, 47 F.3d at 1448 (citing *Bienkowski*, 851 F.2d at 1507–08); *Bodenheimer*, 5 F.3d at 959; *see also Furnco Constr. Corp.*, 438 U.S. at 578, 98 S.Ct. at 2950; *Waggoner*, 987 F.2d at 1165; *Thornbrough*, 760 F.2d at 647. Here, Chevron made a business decision to select Harvey for inclusion in the company-wide reduction-in-force due to her relatively poor work performance as reflected in the evaluations used by the PDC to assess each member of the department. The employees selected to remain in Harvey's position, six females and one male, had clearly superior evaluations, suggesting that gender played no role in the reduction-in-force determination. Harvey has failed to adduce sufficient evidence to refute the non-discriminatory reason proffered by Chevron for Harvey's termination or even to raise a fact issue with regard to pretext.

Therefore, summary judgment is warranted with respect to Harvey's sex discrimination claims.

## C. Sexual Harassment

■ Harvey alleges a sexual harassment claim created by an alleged relationship between her indirect supervisor, Guise, and another employee, Naff. Harvey asserts in ¶ 10 of her amended complaint that:

> ... Ed Guise, a supervisory employee with defendant began attempting to have personal and/or sexual relationship with at least one female employee in the department, Colleen Naff. As a result of Guise's preference for the female employee, he gave her preferential treatment over and above similarly situated female employees. As a direct result of Guise's obsession with the female co-worker, as a manager he vigorously promoted Naff's career, to the detriment of plaintiff's. Said conduct amounts to sexual harassment for which plaintiff now seeks relief.

Chevron contends that Harvey's sexual harassment claim is not cognizable under Title VII.

Two principal theories of sexual harassment are recognized under Title VII—hostile work environment and *quid pro quo. See Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). A cause of action for hostile work environment requires the existence of severe or pervasive and unwelcome verbal or physical harassment of the plaintiff due to the plaintiff's membership in a protected class. *See Vinson,* 477 U.S. at 66–67, 106 S.Ct. at 2405–06; *Sischo–Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1109 (9th Cir.1991); *Young v. Will County Dept. of Pub. Aid,* 882 F.2d 290, 294 (7th Cir.1989); *Jones v. Flagship Int'l,* 793 F.2d 714, 719–20 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). To establish liability for *quid pro quo* harassment, the employee's acceptance of the harassment must be an expressed or implied condition of the receipt of a job benefit, or the employee's rejection of the harassment must cause a tangible job detriment. *See Ellert v. University of Tex.,* 52 F.3d 543, 545 (5th Cir.1995); *Collins v. Baptist Mem'l Geriatric Ctr.,* 937 F.2d 190, 196 (5th Cir.1991), *cert. denied,* 502 U.S. 1072, 112 S.Ct. 968, 117 L.Ed.2d 133 (1992); *Jones,* 793 F.2d at 722. In essence, an employer may not require sexual favors from an employee as a *quid pro quo* for job benefits. *Id.* at 721. Harvey is not asserting either of these theories, however, as she does not contend that she was subjected to a hostile work environment laden with unwelcome verbal or physical harassment by Guise. She, likewise, does not maintain that she was required to dispense sexual favors to be hired, promoted, or retained, nor that she was treated unfavorably because she rebuffed sexual advances made by Guise.

"Most circuits refuse to extend Title VII to employment decisions that are not directly related to impermissible gender-based distinctions." *Ellert,* 52 F.3d at 546 & n. 11 (citations omitted); *see also Smith v. Liberty Mut. Ins. Co.,* 569 F.2d 325, 326–27 (5th Cir.1978); *Cairo v. OH Material Corp.,* 710 F.Supp. 1069, 1071 (M.D.La.1989). Alleged favoritism to a paramour generally has been held not to constitute discrimination in violation of Title VII because the alleged discrimination is not based on the plaintiff's gender. *See Becerra v. Dalton,* 94 F.3d 145, 149–50 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1087, 137 L.Ed.2d 221 (1997); *Ellert,* 52 F.3d at 546 & n. 10; *DeCintio v. Westchester County Med. Ctr.,* 807 F.2d 304, 306–07 (2d Cir.1986), *cert. denied,* 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987); *O'Patka v. Menasha Corp.,* 878 F.Supp. 1202, 1205–09 (E.D.Wis.1995); *Thomson v. Olson,* 866 F.Supp. 1267, 1272 (D.N.D.1994), *aff'd,* 56 F.3d 69 (8th Cir.1995); *Piech v. Arthur Andersen & Co.,* 841 F.Supp. 825, 829 (N.D.Ill.1994); *Ayers v. American Tel. & Tel. Co.,* 826 F.Supp. 443, 445 (S.D.Fla.1993); *Candelore v. Clark County Sanitation Dist.,* 752 F.Supp. 956, 960 (D.Nev.1990), *aff'd,* 975 F.2d 588 (9th Cir.1992); *see generally Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 859–62 (3d Cir.1990); *Autry v. North Carolina Dep't of Human Resources,* 820 F.2d 1384, 1386–87 (4th Cir.1987); *Cairo,* 710 F.Supp. at 1071; *Miller v. Aluminum Co. of Am.,* 679 F.Supp. 495, 501 (W.D.Pa.1988), *aff'd,* 856 F.2d 184 (3d Cir.1988). In addition

to the case law, the EEOC Policy Guidance on Employer Liability under Title VII for Sexual Favoritism notes:

> Not all types of sexual favoritism violate Title VII. It is the Commission's position that Title VII does not prohibit isolated instances of preferential treatment based upon consensual romantic relationships. An isolated instance of favoritism toward a "paramour" (or a spouse, or a friend) may be unfair, but it does not discriminate against women or men in violation of Title VII, since both are disadvantaged for reasons other than their genders. A female [plaintiff] who is denied an employment benefit because of such sexual favoritism would not have been treated more favorably had she been a man nor, conversely, was she treated less favorably because she was a woman.

EEOC Notice No. 915–048 (Jan. 12, 1990), at 2; *see also Hennessy v. Penril Datacomm. Networks, Inc.,* 69 F.3d 1344, 1353–54 (7th Cir.1995). EEOC guidelines are accorded deference in discrimination cases. *See Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404–05. In short, as Chevron points out, "Title VII does not protect employees from hostile conduct that is not based on their protected status." *Farpella–Crosby v. Horizon Health Care,* 97 F.3d 803, 806 n. 2 (5th Cir.1996).

Harvey's claims that Guise showed favoritism to Naff by giving her high visibility projects, special committee assignments, more opportunities to travel, a lighter workload, and hours of personal attention, are unrelated to Harvey's gender. As the Second Circuit explained in *DeCintio:*

> [The selecting official's] conduct, although unfair, simply did not violate Title VII. [The plaintiffs] were not prejudiced because of their status as males; rather, they were discriminated against because [the selecting official] preferred his paramour. [The plaintiffs] faced exactly the same predicament as that faced by any woman applicant for the promotion: No one but [the paramour] could be considered for the appointment because of [the paramour's] special relationship to [the selecting official].

807 F.2d at 308. Thus, the alleged preferential treatment of Naff by Guise, if true, while perhaps unfair, is not discrimination on the basis of sex in violation of Title VII.

Even if Title VII did recognize sexual harassment claims based on the favoritism of one female over another, Harvey admitted at her deposition that she had no facts to support her contention that Guise was romantically involved with Naff.

Q: And as we sit here today, do you believe that a document that is a matter of public record should contain a statement that he [Guise] may have attempted to have a sexual relationship with Ms. Naff or anyone else?

A: If that's the basis of my legal complaint, yes, ma'am.

Q: So you believe that it belongs in here?

A: Yes, ma'am.

Q: And you don't believe that's gossip?

A: No, ma'am.

Q: But you have no facts to support it?

A: That is correct.

Additionally, Harvey offers no evidence that Guise and Naff were involved in a physical relationship of any kind. In fact, Harvey testified at her deposition that she never heard Guise ask for sexual favors, tell dirty jokes, proposition, or touch anyone inappropriately:

Q: Now, you never saw—let me ask you this: Mr. Guise never made a pass at you. Correct?

A: No.

Q: He never talked dirty to you, did he?

A: No, ma'am.

Q: He never asked you for sexual favors. Correct?

A: No, ma'am.

Q: He never sexually touched you in any way. Correct?

A: No, ma'am.

Q: And you never saw him make a dirty joke, correct, or heard him make a dirty joke?

A: I don't believe so, no, ma'am.

Q: And you never saw him asking Ms. Naff for sexual favors. Correct?

A: No, ma'am.

Q: And you never saw him touching her in an inappropriate way, did you?

A: No, ma'am.

Q: And you never saw him proposition Ms. Naff or heard him proposition Ms. Naff. Correct?

A: No, ma'am.

Instead, Harvey maintains that Guise paid too much attention to Naff, gave Naff special projects, and allowed Naff to travel on two occasions. At her deposition, however, Harvey could not name one instance in which a special project was given to Naff nor any specific instances in which Guise paid too much attention to Naff:

Q: My question was: Did you see this as a "Colleen versus you" in terms of certain assignments or promotions? If not Colleen, it would have been you?

A: Well, let's see. Yes, ma'am.

Q: And what assignments or promotions or career advantages do you contend you were competing one to one with—with Colleen?

A: I can't name for you all the committees and projects and special assignments that Colleen was given. I—I don't know them all. I—I don't have a list of them.

Q: What can you recall?

A: I don't know that I can recall particular names. It's just that practically every one that came along, she was given.

Q: Well, can you be specific in terms of just giving me examples? You say "practically every one." Can you think of any one assignment that was given to Colleen that you think you would have gotten except for what you believe was the favoritism shown to her by Mr. Guise?

A: I cannot name a specific one, no.

Additionally, Harvey testified that one of the two trips about which she complains occurred before Harvey returned to Houston:

Q: But my question was: Is when you are talking about this California trip—

A: Yes, ma'am.

Q: —the trip you are referring to occurred when you were not reporting to Mr. Guise. Correct?

A: Correct.

Harvey subsequently testified that the second trip, which took place soon after Harvey's arrival in Houston, was a project involving a liaison between the New Orleans and Houston offices. She testified that she did not really disagree with Naff's participation in that trip and made no assertion that she should have been selected instead:

Q: And did you disagree with Ms. Naff's participation in this trip for this purpose [to serve as production liaison]?

A: Well, only in the sense that another employee had actually made the recommendation for the project and the assignment was given to Ms. Naff instead of to that other employee.

Harvey stated that those two trips were the only out-of-town trips that represented special treatment of Naff by Guise.

Harvey has not brought forward competent summary judgment evidence of preferential treatment. Harvey's claim that Guise and Naff were romantically linked is supported only by gossip and hearsay. "Evidence on summary judgment may be considered to the extent not based on hearsay or other information excludable at trial." *See Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995). Harvey has not identified a single special assignment given to Naff by Guise. In addition, Harvey only recalled two trips that she contends constituted favorable treatment of Naff by Guise—one trip to which Harvey had no personal objection and the other which occurred before Harvey was under Guise's supervision in Houston. Hence, Harvey's claims amount to nothing more than her subjective belief of preferential treatment, which cannot serve as the basis for judicial relief. *See, e.g., Grimes v. Texas Dept. of Mental Health*, 102 F.3d 137, 139 (5th Cir.1996); *Nichols*, 81 F.3d at 42; *Douglass*, 79 F.3d at 1429–30; *Ray*, 63 F.3d at 434; *Armendariz*, 58 F.3d at 152; *Louisiana*

*Office of Community Servs.,* 47 F.3d at 1448; *Portis,* 34 F.3d at 329; *Grizzle,* 14 F.3d at 268; *Molnar,* 986 F.2d at 119; *Republic Ref. Co.,* 924 F.2d at 96. Moreover, Harvey overlooks the fact that Guise, along with other managers, appointed her, rather than Naff, Editor of the Land Business Unit Newsletter—a high profile assignment.

Because favoritism of a paramour is not a viable claim under Title VII and, if it were, Harvey has failed to demonstrate through competent summary judgment evidence any favoritism of Naff by Guise, Harvey's sexual harassment claim must fail.

### D. *Retaliation Claim*

Harvey claims that Guise, with the cooperation of Wagstaff, retaliated against her for complaining about Guise's alleged favoritism towards Naff. Specifically, Harvey identifies three employment decisions as retaliatory: (1) Chevron's 1991 exclusion of her from a created department in the Law Unit; (2) Wagstaffs promotion of someone else to the supervisory position in February 1992; and (3) Chevron's decision to lay off Harvey along with 2,218 other employees in August 1992.

#### 1. *Prima Facie Case*

Title VII prohibits employers from retaliating against employees who oppose unlawful employment practices. *See* 42 U.S.C. § 2000e–3(a). To establish a *prima facie* case of retaliation in violation of Title VII, a plaintiff must show:

(1) she engaged in activity protected by Title VII;

(2) an adverse employment action occurred; and

(3) a causal connection between the participation in the protected activity and the adverse employment decision.

*See Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995); *accord Ray,* 63 F.3d at 435 n. 22; *Mayberry,* 55 F.3d at 1092; *Pierce v. Texas Dep't of Criminal Justice,* 37 F.3d 1146, 1151 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1957, 131 L.Ed.2d 849 (1995); *Barrow v. New Orleans S.S. Ass'n,* 10 F.3d 292, 297 (5th Cir.1994); *Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 42 (5th Cir.1992). To

maintain an action for retaliation, an employee need only establish that she had a reasonable belief that discriminatory practices existed. *See De Anda v. St. Joseph Hosp.,* 671 F.2d 850, 853 n. 2 (5th Cir.1982). "Once the *prima facie* case is established, the burden of producing some non-discriminatory reason for its action falls upon the defendant." *Shirley,* 970 F.2d at 42 (citing *EEOC v. J.M. Huber Corp.,* 927 F.2d 1322, 1326 (5th Cir. 1991)). If the employer meets its burden, the employee then bears the ultimate burden of showing that the reasons given by the employer are a pretext for retaliation. *See id.* To prevail at trial, the employee must demonstrate that her opposition to unlawful activity was a motivating or determinative factor in the adverse employment action taken by her employer, i.e., there must be a causal connection. *See Jack v. Texaco Research Ctr.,* 743 F.2d 1129, 1131 (5th Cir. 1984); *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116 (5th Cir.1983).

#### a. *Protected Activity*

■ Chevron contends that Harvey cannot establish a *prima facie* case of retaliation because she did not engage in protected activity. Chevron argues that opposition to a legal practice is not protected activity under Title VII and cannot serve as the basis for a Title VII retaliation claim. Additionally, Chevron maintains that Harvey could not have reasonably believed that Guise's alleged favoritism of Naff constituted unlawful discrimination by Chevron.

An individual engages in protected activity under Title VII when the individual "has opposed any practice *made an unlawful employment practice by [Title VIII]* . . . ." 42 U.S.C. § 2000e–3(a) (emphasis added.) In addition, individual must establish that she had an objectively reasonable belief that the employer's practices were unlawful. *See De-Anda,* 671 F.2d at 853 n. 2; *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1140 (5th Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982). The Fifth Circuit has not addressed the issue of whether a subjective good faith requirement, in addition to the reasonable belief test, is necessary. *See id.* at 1141 n.

11. In *Payne*, the court determined that it need not decide that issue because the plaintiff in that case believed reasonably and in good faith that the employer was engaged in unlawful employment practices, and the plaintiff's opposition was in response to that belief. *See id.*

The Eleventh Circuit has noted, however, that in order for a plaintiff to establish a *prima facie* case of retaliation under the opposition clause, she must establish a "good faith, reasonable belief that the employer was engaged in unlawful employment practices." *See Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir.1997). The court reasoned:

> It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Id.* (emphasis in original). The court went on to find, however, that the plaintiff need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a *prima facie* case and defeat a motion for summary judgment. *See id.* "[S]uch a requirement '[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances.'" *Id.* (quoting *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir.1978)); *see also Payne*, 654 F.2d at 1140.

Here, Harvey has not established an objective, good faith belief that Guise's alleged favoritism of Naff was an unlawful employment practice. Harvey makes the self-serving statement in her affidavit, "I reasonably believed this favoritism towards another female employee constituted sexual harassment and discrimination." Harvey also concedes, however, "I am not a Title VII lawyer nor did I ever read or research this area of the law." Hence, Harvey bases her claims on nothing more than office gossip and her own speculation. This is not the basis upon which a reasonable person, much less an attorney, would voice a complaint of unlawful employment practices.

In any event, a plaintiff may not maintain a claim for "opposition clause" retaliation where the activity about which she complains, even if it occurred, is not actionable under Title VII. *See Sarff v. Continental Express*, 894 F.Supp. 1076, 1082 (S.D.Tex. 1995), *aff'd*, 85 F.3d 624 (5th Cir.1996). In *Sarff*, the court found that a male plaintiff who complained about sexual harassment could not maintain a claim under Title VII for "opposition clause" retaliation because the perceived harassment was based on the perception of the plaintiff's co-worker that the plaintiff was homosexual. *See id.* Sarff's complaints consisted of "finding items which he suspected were planted by a male co-worker ... consisting of seven advertisements, two pairs of earrings, lipstick, and a brush, which he believed to be a make-up brush." *Id.* In his EEOC charge, Sarff stated, " 'I believed that the actions directed toward me by [the co-worker] were sexual harassment because he simply presumed that I am gay and proceeded to act upon a stereotype to humiliate me.' " *Id.* The court observed that Title VII does not "forbid sexual discrimination based on sexual orientation." *See id.* Thus, the court concluded, "Sarff did not complain of any activity protected by Title VII, for even if he proved that all the events he alleges happened did, in fact, occur, Title VII would still provide no protection for him." *Id.*

As noted above, Guise's alleged favoritism of Naff is not an unlawful employment practice under Title VII. *See Becerra*, 94 F.3d at 149–50; *DeCintio*, 807 F.2d at 306–07; *Thomson*, 866 F.Supp. at 1272; *Clark*, 752 F.Supp. at 960. Thus, when Harvey reported to Wagstaff her perception that Guise showed favoritism to Naff, she did not complain of any activity protected by Title VII. *See generally Sarff*, 894 F.Supp. at 1082. As

such, Harvey has failed to satisfy the first requirement of a *prima facie* case of retaliation—that she participated in a statutorily protected activity.

### b. *Adverse Employment Action*

■ Moreover, with respect to the second element of a *prima facie* case of retaliation, while Harvey's lack of promotion to supervisor and her termination were adverse employment decisions, it is not apparent that Harvey's failure to be transferred to the Upstream Law Unit constituted an adverse employment action. If the transfer was a promotion for Harvey, the denial of such transfer could be considered an adverse employment action. Yet, if the transfer did not constitute a promotion or would not have resulted in an increase in pay, then it would not fall under the Fifth Circuit's interpretation of an adverse employment action.

"'Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.'" *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997) (quoting *Dollis*, 77 F.3d at 781–82 (citing *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981))). In *Dollis*, the Fifth Circuit found that an employee's allegations that she was not considered for a promotion, was not permitted to attend a training conference, had her work criticized by a government vendor, was given false information regarding aspects of her employment, and was denied a desk audit were not actionable adverse personnel actions. *See* 77 F.3d at 779–82. The court concluded that none of the employee's complaints rose to the level of an "ultimate employment decision that Title VII was intended to address." *Id.* at 782. Similarly, in *Mattern*, the Fifth Circuit found that hostility displayed by fellow employees, having tools stolen, supervisors visiting the plaintiff's home after she called in sick, a verbal threat of being fired, a reprimand for not being at her assigned station, a missed pay increase, and being placed on "final warning" did not constitute adverse employment actions prohibited by Title VII. *See* 104 F.3d at 707–08. The court explained that

"Title VII's anti-retaliation provision refers to ultimate employment decisions, and not to an 'interlocutory or mediate' decision which can lead to an ultimate decision." *Id.* at 708. The court reasoned:

> To hold otherwise would be to expand the definition of 'adverse employment action' to include events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee—anything which *might* jeopardize employment in the future. Such expansion is unwarranted.

*Id.* (emphasis in original).

Nonetheless, without regard to whether the transfer to the Upstream Law Unit would qualify, Harvey has set forth sufficient facts to establish the second element of a *prima facie* case—her lack of promotion to supervisor and her termination.

### c. *Causal Connection*

Harvey also has made a sufficient showing, albeit minimal, of the third element of a *prima facie* case—some causal connection between the activity and the adverse action. Harvey contends that she complained to Wagstaff that "Guise's conduct was violating Title VII." Subsequently, Guise did not recommend her for transfer to the Legal Department, which according to Harvey, raises an inference that Wagstaff told Guise of Harvey's complaints. Harvey claims that prior to her complaint to Wagstaff, Guise had twice stated Harvey was a legitimate candidate for the Legal Department. Harvey also asserts that Wagstaff stated that Harvey was a negative person and not a positive influence in the work unit during the PDC meeting regarding the 1992 reduction-in-force.

The Fifth Circuit recently commented on this aspect of the *prima facie* case:

> At first glance, the ultimate issue in an unlawful retaliation case—whether the defendant discriminated against the plaintiff *because* the plaintiff engaged in conduct protected by Title VII—seems identical to the third element of the plaintiff's prima facie case—whether a *causal* link exists between the adverse employment action and the protected activity. However, the

standards of proof applicable to these questions differ significantly.

*See Long v. Eastfield College,* 88 F.3d 300, 305 n. 4 (5th Cir.1996). Indeed, the court acknowledged that the standard for establishing the 'causal link' element of the plaintiff's prima facie case is much less stringent than that of the ultimate issue in an unlawful retaliation case. *See id.* (citing *McMillan,* 710 F.2d at 1116–17). The court took note of the Eleventh Circuit's view that "a plaintiff may satisfy the 'causal link' element of his prima facie case by showing that the protected activity and the adverse employment action 'were not wholly unrelated.'" *Id.* (quoting *Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir.), *cert. denied,* 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985)). Although the Fifth Circuit did not adopt the Eleventh Circuit's approach, the court observed that "a plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a prima facie case." *Id.* (*citing DeAnda,* 671 F.2d at 857 n. 12).

Nevertheless, as discussed above, while Harvey may have demonstrated the second and third elements, she has failed to establish a *prima facie* case of "opposition clause" retaliation because she has not shown that she participated in a protected activity.

2. *Legitimate, Nondiscriminatory Reason*

If Harvey had established a *prima facie* case of "opposition clause" retaliation, however, Chevron has articulated a legitimate, nondiscriminatory reasons for its actions.

a. *Law Unit Transfer*

■ With respect to Harvey's claim that Guise retaliated against her when he assessed her as a potential candidate for transfer to the Upstream Law Unit and ranked her in the lower cluster, Chevron points out that no one on the PDC was aware of Harvey's favoritism report. Additionally, Chevron notes that Harvey has never claimed that

she was clearly better qualified than any person who was recommended or ultimately selected for the Upstream Law Unit.[4]

Formation of a separate legal department for the Upstream Production Division created some new openings for attorneys who were members of the Land Business Unit. Branstetter, Vice President and General Manager of the Land Business Unit, testified at deposition that Chevron filled these positions by first determining which attorneys in each section of the Land Business Unit were interested in being considered for the positions. Afterwards, during the Land Business Unit's PDC meeting, each manager placed each interested candidate serving under that manager into three groups or clusters—strong chance, reasonable chance, and less likely chance.[5] Next, the PDC discussed the people who had been placed in each cluster and whether they belonged in that cluster or somewhere else. Both Branstetter and Guise testified at their depositions that the PDC reached a consensus on the slate of candidates to recommend that the General Counsel, Pat Hobin ("Hobin"), interview to fill the twenty-two positions in the newly-created Upstream Law Unit. This slate of candidates did not include Harvey.

As Manager of Property Administration, Guise assessed all interested candidates in his group, including Harvey. At his deposition, Guise testified that based on his experiences with Harvey's performance, he placed her in the lower cluster. Guise similarly ranked three other interested candidates in his group. Guise further stated that when the discussion of Harvey's candidacy occurred in the PDC, he expressed his opinion that Harvey was negative, confrontational, lacked client focus, and was not a team player. Guise recalled that other managers on the PDC, including Cain, Peterson, Palmer, and Branstetter, were personally familiar with Harvey and provided confirmation of his opinions. Ultimately, the PDC selected thirty candidates from the fifty-two interest-

---

4. Incidently, although Guise and the PDC apparently did not consider it, Chevron notes that Harvey had to take the Bar exam three times before she passed and that she graduated in the bottom one-third of her law school class.

5. At this time, the Land Business Unit PDC included Branstetter, Guise, Wilson, Rob Peterson ("Peterson"), Bob Palmer ("Palmer"), Cain, Baldwin, Messer, and Dumas.

ed applicants and forwarded those names to Hobin. Based on their assessment of Harvey, the PDC did not select Harvey as a candidate Hobin should interview for the Upstream Law Unit. After interviewing the selected candidates, Hobin made the final selection for the available positions.

The summary judgment evidence reveals that the relevant decision makers were unaware of Harvey's report to Wagstaff concerning Guise's alleged favoritism of Naff. In her affidavit, Wagstaff stated, "I never disclosed Ms. Harvey's report to anyone, including Mr. Guise." This is confirmed by the deposition testimony of both Guise and Branstetter, who both denied any knowledge of Harvey's allegations of favoritism until this lawsuit. As a result, no one on the PDC knew about Harvey's report, including Guise. "[A]n employer cannot be guilty of retaliation for an employee's opposition to discrimination unless he is aware of that opposition." *Corley v. Jackson Police Dept.*, 639 F.2d 1296, 1300 (5th Cir.1981). Thus, contrary to Harvey's assertion, it is apparent that no retaliatory animus on the part of Guise for her favoritism report caused her low cluster ranking. Rather, the unrefuted summary judgment evidence reveals that the PDC collectively agreed on Harvey's ranking and her exclusion from the list of candidates submitted to Hobin for the Upstream Law Unit.

### b. *Promotion to Supervisor*

■ With regard to Harvey's claim that the selection of Rewerts to fill Wagstaff's position was motivated by retaliation against Harvey due to the favoritism report, Chevron maintains that Wagstaff selected Rewerts because he was better qualified than Harvey and the other candidates for the supervisory position.

On January 1, 1992, Guise transferred to the Law Unit, and Chevron promoted Wagstaff to replace Guise as the Manager of Property Administration. Because Guise had transferred to a different unit, he played no role in the process of selecting a new supervisor to fill Wagstaff's position. Harvey argues, however, that Guise "poisoned" her reputation with others who would be making a decision about her future, including Wagstaff. "To be probative, allegedly discriminatory statements must be made by the relevant decision maker." *Nichols*, 81 F.3d at 41–42. Here, Guise did not play a role in the selection of Rewerts to fill the supervisory position. Therefore, any alleged retaliatory intent on the part of Guise could not have had an effect on the selection of a supervisor.

Furthermore, in her affidavit, Wagstaff stated that she chose Rewerts to succeed her as a supervisor in the Property Administration Group because she "wanted an enthusiastic and innovative employee who exhibited strong leadership, communication, and coaching skills, and who could effectively motivate employees." Wagstaff based her decision on reports that she received about Rewerts indicating that he possessed these qualities. Wagstaff stated that she ruled out Harvey for this supervisory position because, based on her twelve-month experience as Harvey's immediate supervisor, she concluded that Harvey:

(1) lacked teamwork skills;

(2) possessed average analytical skills; and

(3) had, on repeated occasions during 1991, exhibited a challenging and confrontational method of dealing with other employees and management.

In addition, at deposition, Wagstaff testified that she did not think Harvey's negative attitude fostered teamwork. Specifically, Wagstaff stated, "She was very—she viewed the job as clerical. She was not happy to be in the job that she was in, and that certainly was not a positive factor in trying to create a harmonious group that were proud and enthusiastic about doing their jobs." Consequently, Wagstaff determined, through her experience of working with Harvey, that Harvey did not possess the qualifications she sought for a supervisor in the unit. In her affidavit, Wagstaff explained:

After my discussions with Mr. Rewerts' previous supervisors, my review of his past performance evaluation, and my interviews, I selected Mr. Rewerts to fill the supervisory position because I believed, among other things, that he: (1) was highly respected; (2) had a high level of intelligence and could assist the section in identi-

fying opportunities to serve our production and land division customers better; (3) had an easy, friendly style with people; and (5) was creative and responsible.

Although Harvey assumes that the selection of supervisor came down to a choice between her and Rewerts, Wagstaff stated in her affidavit that she eliminated Harvey as a candidate before a "short list" was developed. Hence, the decision was not one of Rewerts versus Harvey. Moreover, as Chevron points out, it made little sense to promote an employee who showed contempt for the very department in which the supervisory position was open.

Harvey's assertion that she never received negative evaluations in almost ten years of service with Chevron, until after her she complained to Wagstaff in 1991, is not entirely accurate and is inadequate to refute Chevron's gender-neutral reason for promoting Rewerts rather than Harvey. Contrary to her assertion, Harvey had received a prior evaluation that contained comments that could be construed as negative. In her November 1985 evaluation, the comment portion included the following statement: "Employee is a good worker whose performance has slipped somewhat over the past year as compared to the previous year. With a little more attention to detail and study of section procedures, it is expected that she will make a strong comeback." As a result, in Harvey's November 1985 Placement Recommendation under "Assessment of Employee Promotability," Harvey was deemed not promotable at present and was considered satisfactorily placed at her current level. Moreover, "an 'attempt to equate years served with superior qualifications ... [is] unpersuasive.'" *Nichols*, 81 F.3d at 42 (quoting *Bodenheimer*, 5 F.3d at 959). As the Fifth Circuit observed in *Nichols*, while work experience is one component of defining who is more qualified, *Bodenheimer* mandates that greater experience alone will not suffice to raise a fact question as to whether one person is clearly more qualified than another. *See id.* More evidence, such as comparative work performance, is needed. *See id.* When comparative work performance is considered, Rewerts was manifestly the more de-

sirable candidate for promotion to supervisor.

#### c. *Inclusion in Reduction–in–Force*

■ Finally, Harvey contends that Chevron retaliated against her when it selected her for inclusion in its 1992 reduction-in-force. Although it is somewhat unclear, it appears that Harvey is claiming that Wagstaff became the conduit for Guise's retaliatory motives after Guise was transferred to another division and no longer served on the Land Business Unit PDC. In this context, Harvey surmises that Wagstaff somehow "poisoned" the PDC against her. With respect to these contentions, Chevron maintains that it underwent a workforce reduction, and the PDC as a whole, rather than Wagstaff individually, determined who would fill the remaining positions.

As discussed above, Chevron reduced its work-force in August 1992 due to the sale of some of its mineral properties. After evaluating which positions were essential for its continuing operations, Chevron assigned each division manager the task of selecting the employees to fill the positions that would remain following the reorganization. The division managers evaluated the employees in their sections using a candidate selection sheet, which contained a uniform set of performance dimensions to assess the employees' recent job performance. When Branstetter was asked at his deposition whether the managers were given any guidelines or standards to consider in completing the candidate selection sheets, he responded: "Well, it was—it was certainly left up to the discretion of the managers. And they were evaluating employees on a consistent set of—of performance dimensions, I guess you'd say." Branstetter testified that after the division manager completed the candidate selection sheets, the PDC met and discussed each candidate for the remaining positions. Thus, the PDC compared the employee's particular skills and qualifications with the specific skills and attributes required for each position. At his deposition, Branstetter described the process as follows:

I believe the next step was that all the managers and I met and looked at the

number and locations of the positions that we were going to have in the new organization and then considered all the candidates we had for those positions and discussed them, using the candidate selection sheets as input and then checking to get the best sense that we could for consistency and to see whether some managers may have comments about employees in other groups based on experiences they had had, and then having full discussion, making selection for the open positions.

When questioned how the selections were made for the open positions, Branstetter stated that although he had ultimate authority over the final selection, the PDC made each decision by consensus.

As noted above, as the Manager of Property Administration, Wagstaff completed Harvey's candidate selection sheet. Under section 1 of the candidate selection sheet, "Skills Required," Harvey's performance was rated "Low" in four areas, "Fair" in two areas, and "Good" in one area. Under section 2 entitled, "Job Knowledge & Experience Required," Harvey was assessed as "Medium" in four areas, "Low" in one area, and "N/A" in one area. Wagstaff noted in her affidavit, that "[d]uring the PDC's selection process, no manager's opinion or evaluations of employees—including mine—were 'rubber stamped' by the PDC. "According to Wagstaff, "Each member of the PDC engaged in open discussion about each manager's assessment of every employee under consideration, including Ms. Harvey." Branstetter testified at deposition that Wagstaff expressed concern over Harvey's attitude. Specifically, he recalled that Wagstaff had commented that Harvey was a "rather negative person and not a positive influence in the work unit or—a good team type employee, and came across as—as somewhat confrontational, that sort of thing." Branstetter personally recalled one instance in which he observed Harvey's negative approach to her duties, arising out of an article she drafted for the Land Business Unit newsletter. Although Branstetter could not recall the specifics of the article, when he was asked what he meant about her negative approach, he responded:

Only in general terms, and generally, I remember my feeling being that she was writing an article for a business unit-wide newsletter to go to all people in the business unit, and the purpose of the newsletter is to build teamwork and—alignment and collegiality and—and the like, and I remember reading the draft of the article and thinking, "This person is on my team, and—and the editor of my newsletter and "—you know, and this is not appropriate the way this was drafted. But without regard to whether it was factually correct or not, it was, in my opinion at the time, did not show good judgment for the task at hand and came across as negative.

Hence, due to Harvey's performance problems, negative attitude, confrontational tone with management, and the fact that other employees had the attributes they were seeking for the remaining positions, the PDC, based upon each member's independent judgment, collectively chose not to select Harvey to fill one of the seven remaining land representative positions. In this situation, the PDC was not a mere "rubber stamp," but rather made an independent judgment to include Harvey in the reduction-in-force. Cf. Shager v. Upjohn Co., 913 F.2d 398, 405–06 (7th Cir.1990).

With respect to Harvey's claim that Guise and Wagstaff retaliated against her for reporting about Guise's preference for Naff and somehow poisoned the PDC, Harvey has failed to demonstrate a connection between her report concerning Guise and the decision of the PDC to select Harvey for inclusion in the reduction-in-force. Moreover, she has not shown that Wagstaff had an adverse reaction to her report or that she had a motive for retaliating against Harvey for making a report about Guise. It is undisputed that Guise transferred to the Law Unit in January 1992 and was not a member of the Land Business Unit PDC that evaluated Harvey in relation to the workforce reduction. In any event, at deposition, Guise testified that he was unaware of Harvey's report to Wagstaff that he showed favoritism to Naff until this lawsuit. Additionally, Wagstaff testified that she never told Guise of

Harvey's complaints about him. In her affidavit, Wagstaff stated:

> In April of 1991, Ms. Harvey informed me that she believed Mr. Guise was showing favoritism towards Ms. Naff. Because Ms. Harvey asked me to keep her report confidential and never expressly asked me to speak to Mr. Guise about her report of "favoritism," I never disclosed Ms. Harvey's report to anyone, including Mr. Guise. In fact, Ms. Harvey's report of favoritism by Mr. Guise to Ms. Naff did not seem to me to have any substance and it did not seem significant to me.

Moreover, Harvey does not rebut Wagstaff's statements in her affidavit that the report did not offend her or lead her to take adverse action against Harvey.

> As a supervisor, I considered it part of my job to listen to Ms. Harvey's 1991 report about Mr. Guise. Ms. Harvey's report about Mr. Guise did not offend, upset, or bother me. I did not take any unfavorable or adverse employment action against Ms. Harvey because she made the "favoritism" report to me. Moreover, no one influenced my opinions about Ms. Harvey. I used my own independent judgment with respect to every opinion I ever related and every decision I ever made with respect to Ms. Harvey.

In her deposition, Harvey did not refute Wagstaff's statement that she had asked Wagstaff not to mention her accusations to Guise and further stated that she never complained to Guise directly. Nevertheless, in her response to Chevron's motion for summary judgment, Harvey points out that Chevron's Legal Department spoke to Guise concerning Naff in November 1991, maintaining that this indicated that Guise was aware of Harvey's report. At his deposition, however, Guise dispelled any such notion and made it clear that the Legal Department had spoken to him about Naff in a matter unrelated to Harvey. Therefore, he could not have known or even suspected that Harvey, as opposed to another employee, had made any accusations against him. Hence, the discussion between the Legal Department and Guise has no bearing on this action. Furthermore, because it is apparent that Wagstaff was only one of a number of persons on the PDC who evaluated Harvey, Wagstaff alone could not have made the decision to include her in the reduction-in-force in retaliation for her favoritism report about Guise. The Fifth Circuit has noted that "even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct." *Long*, 88 F.3d at 305 n. 4 (citing *Jack*, 743 F.2d at 1131). Here, Chevron's company-wide layoffs, in addition to Harvey's unsatisfactory performance and negative attitude, destined her for termination without regard to her participation in allegedly protected activities or opposition to perceived discriminatory practices. Moreover, Harvey has adduced no evidence of a similarly-situated employee, who did not oppose perceived discriminatory practices, who kept his or her position despite comparable performance and attitude problems.

### 3. *Pretext*

The next inquiry, therefore, is whether the proffered reason is merely pretextual. To demonstrate a "pretext for discrimination," the plaintiff must show both that the employer's proffered reason for its action was false and that prohibited discrimination was the real reason for the employer's decision. *See St. Mary's Honor Ctr.*, 509 U.S. at 515, 113 S.Ct. at 2751–52.

With respect to Harvey's claim that she was not promoted to a supervisory position by Wagstaff in retaliation for reporting Guise's favoritism, Harvey does not even attempt to show that Chevron's legitimate, nondiscriminatory reason—Rewerts was more qualified and suitable for the position—is pretextual. Thus, summary judgment is appropriate as to this claim.

As to Harvey's claim that she was retaliated against when she was not selected for transfer to the Upstream Law Unit, Harvey argues that Guise's assertion that other managers on the PDC were familiar with Harvey's work is not credible. According to Harvey, none of the persons Guise listed as agreeing with his assessment of Harvey ever had the responsibility for reviewing and sign-

ing Harvey's performance reviews. Harvey's contention that Cain, Peterson, Palmer, and Branstetter never had responsibility for signing her performance reviews, however, does not support a reasonable inference that they were unfamiliar with her or her work or that they could not make an independent judgment of her qualifications for placement in the Upstream Law Unit. Both Guise and Branstetter testified at their depositions that the decision to place an interested candidate into a certain cluster was made by the PDC collectively.

Harvey also argues that prior to her report to Wagstaff, Guise had twice before thought she possessed the skills necessary to transfer to the Legal Department. Presumably, Harvey is referring to three reviews she received between 1982 and 1987. Although Guise approved these evaluations, he was not Harvey's direct supervisor. Harvey's direct supervisor for her 1985 and 1987 evaluations was Heuer, and Guise was the section manager. Moreover, in the Assessment of Promotability section of Harvey's November 6, 1985, Placement Recommendation, the question is asked, "Is employee promotable?" The answer checked was "Not at Present." In the comment section that follows, the review states, "Employee's performance over the past year has slipped from the previous year. It is expected that her performance will rebound during the next year." The October 26, 1987, placement recommendation stated that Harvey was promotable, explaining, "Employee has the experience and educational background to qualify for a higher level supervisory position." As Chevron points out, these evaluations were completed years before the relevant time period and were prepared, in part, by a different immediate supervisor in Chevron's New Orleans office. These differences dispel the asserted relevance Harvey attaches to them. Cf. Mayberry, 55 F.3d at 1090; Republic Ref. Co., 924 F.2d at 97. Thus, Harvey has failed to adduce facts from which it could be inferred that she would have been selected for a position in the Upstream Law Unit but for her complaints to Wagstaff about Guise.

With regard to Harvey's claim that her inclusion in Chevron's 1992 reduction-in-force was in retaliation for her reporting Guise's favoritism, Harvey argues that the PDC did not make an independent decision but instead relied on Wagstaff's evaluation of her abilities. Again, other members of the PDC offered their own independent assessments of Harvey and, by consensus, concluded that Harvey should be laid off. Moreover, even if they did rely primarily on Wagstaff's appraisal of Harvey's performance, there is no evidence that Wagstaff harbored any ill will toward Harvey or that her evaluation was tainted by a distaste for Harvey's report about Guise. In fact, Wagstaff noted in her 1991 evaluation of Harvey that Harvey had a good basic knowledge of agreements and that she was quickly catching on to procedures. The evaluation further stated that Harvey exercised great care in analyzing and following shut-in/cessation events and was thorough in reviewing leases. These comments could hardly be viewed as negative or as evincing a predisposition on the part of Wagstaff to retaliate against Harvey. Although Harvey did not receive an increase in salary, neither her base pay nor her position changed as a result of the evaluation. See generally Meredith v. Beech Aircraft Corp., 18 F.3d 890, 896 (10th Cir.1994).

Thus, other than conclusory allegations and unsubstantiated assertions, Harvey offers nothing to impugn the process the PDC used to arrive at a consensus on the individuals who were to be included in the reduction-in-force. Such allegations and assertions do not fulfill Harvey's summary judgment burden. See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 872–73, 110 S.Ct. 3177, 3180–81, 111 L.Ed.2d 695 (1990); Liquid Air Corp., 37 F.3d at 1075. In sum, Harvey has failed to raise facts from which it could be inferred that "but for" her report to Wagstaff of Guise's alleged favoritism of Naff, she would have been transferred to the Upstream Law Unit, promoted to supervisor, or survived Chevron's 1992 reduction-in-force. See Long, 88 F.3d at 305 n. 4; Ray, 63 F.3d at 435–36; Mayberry, 55 F.3d at 1092. Therefore, Chevron is entitled to summary judgment on Harvey's retaliation claims.

### III. Conclusion

Accordingly, Chevron's Motion for Summary Judgment is GRANTED. There are no outstanding issues of material fact with respect to Harvey's claims of gender discrimination, sexual harassment, or retaliation, and Chevron is entitled to judgment as a matter of law.

IT IS SO ORDERED.