**Granville C. TURNER, Plaintiff,**

v.

**CLAIMS ADMINISTRATION CORPORATION, Defendant.**

**Civil No. SA–97–CA–0278HG.**

United States District Court, W.D. Texas, San Antonio Division.

Feb. 5, 1998.

Ricardo J. Navarro, Denton, McKamie & Navarro, Jeffrey J. Sapyta, Law Office of Jeff Sapyta, San Antonio, TX, for Plaintiff.

Philip J. Pfeiffer, Fulbright & Jaworski, L.L.P., San Antonio, TX, Jeffrey S. Goldman, Michael L. Sullivan, Fox and Grove, Chtd., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

GARCIA, District Judge.

On this day, the Court considered Defendant Claims Administration Corporation's Motion for Summary Judgment (docket no. 38). The defendant seeks summary judgment on Plaintiff Granville C. Turner's claims alleging discrimination under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and The Texas Commission on Human Rights Act, TEX. LAB. CODE ANN. § 21.001 *et seq.* ("TCHRA").

Upon consideration of the motion, the submissions of the parties, the pleadings, and the applicable law, this Court is of the opinion that the motion for summary judgment should be granted.

## I. *Background*

Claims Administration Corporation ("CAC") is a Rockville, Maryland based company whose function is to administer and pay insurance claims under a health benefit plan for federal employees. Granville Turner ("Turner") was hired to work at CAC's San Antonio office on March 6, 1995 as a Customer Relations Associate, or "CRA." Following an initial training session, he was assigned to a team with Theresa Garcia ("Garcia") and Michaela Pansza ("Pansza"). The team was supervised by Colleen Malady ("Malady"), who along with her supervisor, Ruth Ann Goodspeed, had made the initial decision to hire Turner.

Following the birth of his child in July of 1995, a rift regarding the amount of time Turner was taking off from work developed between Turner and Malady. On a few occasions, she refused to give him time off to take care of various matters, many relating to the premature birth of his and his girlfriend's baby, because of a need to have him present to provide adequate coverage of the functions he performed at work. Malady had also received complaints from other workers regarding his absences.

Subsequently, in September of 1995, Malady received complaints from Pansza regarding Turner's behavior at work. She reported that he used foul language, scratched himself, and burped in front of others. It was at about this same time that Turner reported to Malady that he thought that the his co-workers' concerns about the amount of time off he had requested were "racially motivated." Malady reassured him through an e-mail message that this was not the case, and informed the human resources manager, Lisa Nueslein ("Nueslein"), of her discussion with Turner about his concerns.

On or about September 22, 1995, Pansza again approached Malady with complaints about Turner's behavior. These included the continued use of foul language, an allegation that he had dropped his pants in front of Garcia, and that he had made Pansza uncomfortable by getting "too close" and telling stories of his sexual exploits. Three days later, Nueslein met with Pansza to discuss

the allegations. After their meeting, she forwarded the allegations to John Tate ("Tate"), head of human resources for CAC.

Nueslein then met with Turner and told him of the allegations, although she did not identify the source of the complaints. Turner denied the allegations. Nueslein then interviewed Garcia. Garcia reiterated the story of Turner pulling down his pants to tuck in his shirt, and she also told Nueslein that she had observed some of the same behaviors reported by Pansza. At approximately this same time, Turner met with Tate, who was in San Antonio on other matters. Turner sought the meeting because Tate was also an African–American male, and he [Turner] believed that Tate would understand his dilemma and additionally wanted the opportunity to tell his side of the story regarding the allegations that had been made against him.

On October 2, following a series of discussion between Ms. Goodspeed, Malady, and Nueslein, the decision to recommend Turner's termination was made. However, before final approval could be sought from Tate in the Rockville office, Turner came forth on October 3 with a complaint that Garcia had used the word "nigger" in reference to the O.J. Simpson verdict while on the phone with John Cox of the Rockville office. Following interviews with Mr. Cox and Garcia, it was determined that the allegation was untrue, and officers in the San Antonio office proceeded with the recommendation to terminate Turner. Tate directed that the termination be carried out on October 6, 1995, approximately seven months after he had been hired. Turner filed his complaint with the Equal Employment Opportunity Commission ("EEOC") on October 16, 1995, and subsequently filed the instant lawsuit on February 6, 1997.

## II. *Analysis*

### A. *The Summary Judgment Standard*

Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for her motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which she believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir.1988). The moving party, however, need not negate the elements of the non-movant's case. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir.1996); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994).

Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514–15; *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d 1069. The controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party. *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 402 n. 5, 112 L.Ed.2d 349 (1990); *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14; *Judwin Properties, Inc. v. United States Fire Ins. Co.*, 973 F.2d 432, 435 (5th Cir.1992). Nevertheless, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (citations omitted); *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1075. Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552. "In such situation, there can be 'no genuine issue as to any material fact,' since a complete failure of

proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552.

### B. *Title VII and § 1981* [1]

#### 1. *Burden of Proof*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "Section 1981 provides that all persons in the United States shall have the same contractual rights as 'white citizens.'" *LaPierre v. Benson Nissan, Inc.,* 86 F.3d 444, 448 n.2 (5th Cir.1996); *see also* 42 U.S.C. § 1981(a). Specifically, § 1981 states that every person in the United States shall have the same rights as white citizens regarding "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b). In *McDonnell Douglas* and *Burdine,* the United States Supreme Court outlined the burden-shifting framework generally applicable in Title VII and § 1981 cases.[2] *Texas Dept. of Community Affairs v. Bur-*

*dine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

In a case such as this, where there is no direct evidence of discrimination, a plaintiff must initially establish a prima facie case by satisfying a multi-element test from which discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *Chacko,* 960 F.Supp. at 1187; *Wallace,* 80 F.3d at 1047 (citations omitted); *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1087 (5th Cir.1994) (citing *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94).[3] To establish a prima facie case of discriminatory discharge, Turner must show: (1) he is a member of a protected group; (2) he was qualified for the position he held; (3) he was discharged from the position; and (4) he was replaced by someone outside the protected group. *Meinecke v. H & R. Block of Houston,* 66 F.3d 77, 83 (5th Cir.1995); *Portis v. First Nat'l Bank of New Albany,* 34 F.3d 325, 328 n. 6 (5th Cir.1994); *Jatoi v. Hurst–Euless–Bedford Hosp. Auth.,* 807 F.2d 1214, 1219 (5th Cir.), *modified in part on reh'g,* 819 F.2d 545 (5th Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 709, 98 L.Ed.2d 660 (1988); *Chacko,* 960 F.Supp. at 1187. Alternatively, and the more appropriate method in this case, Turner may estab-

---

**1.** This section also encompasses Turner's claims under the TCHRA, as claims under the TCHRA are analogous to Title VII actions and are to be interpreted consistently with federal precedent. *Cervantez v. Bexar County Civil Service Comm'n,* 99 F.3d 730, 734 n. 6 (5th Cir.1996). Similarly, Title VII and § 1981 are recognized as parallel causes of action. *Hamilton v. Rodgers,* 791 F.2d 439, 442 (5th Cir.1986).

**2.** Absent direct evidence of discriminatory intent, the McDonnell Douglas burden-shifting framework applies to § 1981 claims. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989); *LaPierre,* 86 F.3d at 448 n. 2; *Wallace,* 80 F.3d at 1047–48. The Fifth Circuit has regarded the elements of § 1981 claims to be sufficiently similar to those of Title VII actions to warrant the same analysis in many instances. *See Anderson v. Douglas & Lomason Co.,* 26 F.3d 1277, 1284 n. 7 (5th Cir.1994), *cert. denied,* 513 U.S. 1149, 115 S.Ct. 1099, 130 L.Ed.2d 1066 (1995). A thorough example of this analysis can be found in

*Chacko v. Texas A & M Univ.,* 960 F.Supp. 1180 (S.D.Tex.1997).

**3.** Direct evidence is evidence of remarks or actions that, if believed, directly prove that the plaintiff's membership in a protected class was a factor in the defendant's decision to discharge the plaintiff. Stray remarks in the workplace do not constitute direct evidence of discrimination. That is, statements made by persons not involved in the decision to discharge the plaintiff or statements made by decision makers that are unrelated to the decision do not constitute direct evidence that the plaintiff's membership in a protected class influenced the decision. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Young v. City of Houston,* 906 F.2d 177 (5th Cir.1990); *Merrick v. Farmers Insurance Group,* 892 F.2d 1434 (9th Cir.1990); *Gagne v. Northwestern National Insurance Co.,* 881 F.2d 309 (6th Cir. 1989); *Smith v. Firestone Tire & Rubber Co.,* 875 F.2d 1325 (7th Cir.1989).

lish a prima facie case by showing that he is a member of a protected class, he was qualified for the position, and persons outside the class were treated more favorably than he. *Nieto v. L & H Packing Co.*, 108 F.3d 621, 623 n. 5 (5th Cir.1997); *Waggoner v. City of Garland*, 987 F.2d 1160, 1163 (5th Cir.1993); *Johnson v. Chapel Hill Indep. Sch. Dist.*, 853 F.2d 375, 381 (5th Cir.1988); *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir.1985).

Once the plaintiff establishes a prima facie case, then the burden shifts to the defendant to advance—but not prove—a legitimate, nondiscriminatory reason for its employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824; *Davis*, 14 F.3d at 1087. If the employer meets its burden, the prima facie case disappears, and the burden shifts back to the plaintiff to establish that the reason proffered by the employer is merely a pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824; *Chacko*, 960 F.Supp. at 1188 (citations omitted). To demonstrate a "pretext for discrimination," the employee must show both that the employer's proffered reason was false and that prohibited discrimination was the real reason for the employer's decision. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2751–52, 125 L.Ed.2d 407 (1993).

According to the Fifth Circuit, the plaintiff's burden under *St. Mary's Honor Ctr.* is one of establishing that the employer's non-discriminatory reason is not credible and that an unlawful discriminatory intent motivated the employer's action. *Ray v. Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1249 (5th Cir.1995). It is not enough, however, "to disbelieve the employer; the fact finder must believe the plaintiff's explanation of intentional discrimination." *Id.* (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519, 113 S.Ct. at 2753–54). "The question is not whether

the employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995). In the context of a motion for summary judgment, "[a] jury issue will be presented and a plaintiff can avoid summary judgment ... if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons actually motivated the employer and (2) creates a reasonable inference that [citizenship] was a determinative factor in the actions of which the plaintiff complains ." *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 994 (5th Cir. 1996). It must be remembered, at all times the plaintiff has the ultimate burden to prove intentional discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 507, 113 S.Ct. at 2747. This burden may be dispensed with altogether, however, if the plaintiff is able to establish intentional discrimination by direct evidence of discriminatory motive. *Wallace*, 80 F.3d at 1047–48.

■ Nonetheless, an employee's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for judicial relief. *Chacko*, 960 F.Supp. at 1188; *Harvey v. Chevron U.S.A., Inc.*, 961 F.Supp. 1017, 1025 (S.D.Tex.1997).[4] While Title VII protects employees against racial discrimination in their terms and conditions of employment, it does not afford minorities special preferences or place upon the employer an affirmative duty to accord them special treatment. *Williams v. General Motors Corp.*, 656 F.2d 120, 129 (5th Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). Moreover, the employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of business decisions, nor ... to transform the courts into personnel managers." *EEOC v. Louisiana Office of Community Servs.*, 47 F.3d 1438, 1448 (5th Cir.1995) (citing *Bienkowski v.*

---

**4.** *See also Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir.1996); *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 434 (5th Cir.1995); *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 152–53 (5th Cir.1995), *cert. denied*, 516 U.S. 1047, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996); *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir.1994); *Molnar v. Ebasco Con-*

*structors, Inc.*, 986 F.2d 115, 119 (5th Cir.1993) (employee's subjective belief that age discrimination occurred is insufficient to create jury issue when employer articulates an adequate nondiscriminatory reason for the discharge); *Little v. Republic Refining Co.*, 924 F.2d 93, 96 (5th Cir. 1991).

*American Airlines, Inc.,* 851 F.2d 1503, 1507–08 (5th Cir.1988)); *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 959 (5th Cir. 1993).

### 2. The Claims Against CAC

■ Foremost, the Court finds that Turner has failed to establish even a prima facie case of discrimination. Turner is a member of a protected class (African–American), and he was qualified for the position he held based on his previous work experience. However, Turner has failed to demonstrate that other employees were treated more favorably. For example, there is no evidence that Turner was denied time to tend to personal affairs while others were granted such time freely. On page 74 of Turner's deposition, the following exchange takes place:

Q: So sometimes Ms. Malady would grant your requests?

A: Yeah.

Q: And sometimes she would deny them?

A: Yes.

Q: When she denied them, she told you it was because she needed somebody there?

A: Right. Exactly.

Q: And do you have any facts as you sit here today that would indicate that she didn't really need somebody there?

A: No, I do not.

However, assuming that Turner has made out his prima facie case, we proceed to investigate CAC's proffered reason for his termination, i.e., that he had engaged in misconduct such as inappropriate language and conduct. During Turner's tenure at CAC, Malady received complaints from Pansza about Turner's behavior, and some of these offensive behaviors were corroborated by

Garcia, who shared a cubicle with Turner and Pansza. This conduct is a sufficient, nondiscriminatory reason for termination.[5]

The next inquiry, therefore, is whether the proffered reason is merely pretextual. A plaintiff may succeed in demonstrating pretext " 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. According to the deposition testimony of Turner and Malady, Maladay was concerned about the impression of other team members regarding the amount of time Turner had been taking off. They subsequently had a meeting, which Turner described as follows:

A: Well, when she told me about the team was taking offense to me, you know, getting a lot of time off, then that's when I first said, "Well, you know, hey, you know, I mean, I don't know why they're, you know, upset with me. You know, I'm trying to do it through the correct procedures and channels. It's not like I just don't call in, or don't show up, or don't—you know, just blow it off. I mean, I'm really, you know, giving you—keeping abreast. You know, I'm trying to do it by the procedures." And then I said, "Well, you know, then it must be racially motivated," you know, to that extent. And then she's like, "Well, are you thinking I'm a racist?" And I'm like—I said, "I didn't say that. You know, I'm just saying that, you know, I can't see any other reason that anybody would have a problem with it unless it was, you know, just because they didn't like me for whatever reason."

(Turner Depo., Pages 83–84).[6] Yet, as previously stated, an employee's subjective belief

**5.** "[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason ... Motive is the issue ... [A] dispute in the evidence concerning ... job performance does not provide a sufficient basis for a reasonable fact finder to infer that [the] proffered justification is unworthy of credence." *Mayberry,* 55 F.3d at 1091 (quoting *Little,* 924 F.2d at 97); *See also Sherrod v. Sears Roebuck & Co.,* 785 F.2d 1312 (5th Cir.1986); *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1256 (5th Cir.1977); *Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir.1989); *Jones v. Flagship Int'l,* 793 F.2d 714, 729 (5th Cir.1986), *cert.*

*denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987) ("It is sufficient ... that [the employer] had reasonable grounds, or in good faith thought it did ..." for its termination decision); *Dickerson v. Metropolitan Dade County,* 659 F.2d 574, 581 (5th Cir.1981) (even if a employer is wrong in its evaluation, the employer has not violated Title VII if it acted on a reasonable belief).

**6.** On page 82 of Turner's deposition, he states that it is his belief that the only reason his co-workers were so concerned with the amount of time he was taking off was because "I was

of discrimination cannot serve as a basis for relief. *Chacko,* 960 F.Supp. at 1188. Turner has not provided any evidence of anyone other than himself asserting that race, or sex, was the motivating factor in his termination.[7]

Turner has also argued that Garcia's alleged use of the word "nigger" in reference to the verdict in the O.J. Simpson trial illustrates some sort of racial animus on the part of CAC because of the speed in which Turner's complaint was addressed, as compared to complaints against Turner which languished for several months before being brought to his attention. However, this in no way shows that CAC's proffered reason— misconduct—was pretextual. What it does illustrate is a heightened sensitivity to racial slurs in the workplace. Nueslein immediately confronted Garcia regarding the allegation, and John Cox, the person to whom the alleged comment was made, was also interviewed by a human resources assistant at the office in Rockville, Maryland. The allegation was found to be unsupported. However, in a separate and unrelated incident, a Hispanic employee was fired in August of 1995 for using the word "nigger" at work, an allegation which she had also denied.

Turner likewise charges that Nueslein's decision that Turner was unqualified for a Team Leader position constitutes evidence of pretext given his experience at Blue Cross/ Blue Shield. In addition, Turner asserts that all Black applicants were also deemed unqualified. Be that as it may, discrimination laws are not to be used as vehicles for judicial second-guessing of business decisions. *Walton v. Bisco Industries, Inc.,* 119 F.3d 368, 372 (5th Cir.1997); *Guthrie v. Tifco Indus.,* 941 F.2d 374, 378 (5th Cir.1991). Perhaps if Turner could show a history of the failure of CAC to promote Blacks his claims would be more credible, but this seems unlikely given the status to which Tate, also an African–American, has risen in the corporation.

Finally, Turner has claimed that he was treated differently than his female co-workers. He states that they were never disciplined for adjusting stockings, bra straps, and the like, and that tucking in his pants is analogous. But no where is it alleged that any of the female employees indecently exposed areas of their bodies in the work area. Had Turner simply adjusted his pants, it is likely that no complaint would have been lodged. Yet, Garcia clearly articulated that she had seen Turner drop his pants in order to tuck in his shirt.[8] While this single incident may have been insufficient to justify his termination, in conjunction with the other complaints it forms a legitimate reason for his dismissal.

### 3. *Retaliation*

■ With regard to Turner's claims of retaliation, Turner has failed again to establish a prima facie case. Title VII prohibits employers from retaliating against employees who oppose unlawful employment practices. 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation in violation of Title VII, a plaintiff must show: (1) he en-

Black." He goes on to state, however, that his dispute was with Malady. This contradicts his later testimony that "they didn't like me," which seems to indicate his co-workers. On page 84 of Malady's deposition, she states that it was her understanding that Turner felt that his co-worker's feelings may have been racially motivated. This is fatal to Turner's case in that these are the feelings of individuals who were not involved in the decision to terminate Turner's employment. *See also Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir.1990) ("[A]ny wrongful intent on the part of the ordinary employee is not properly imputable to the employer.").

7. In fact, an inference of nondiscrimination applies where the person who recommends hiring someone later terminates that person because it is unlikely that a decision maker "would hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." *Nieto,* 108 F.3d at 624 (citing *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir.1996) (citations omitted)).

8. On page 66 of her deposition, Garcia states "I was sitting at my desk, my back to him, and I turned around, and he had his pants at his knees. And I said 'Craig.' And he turned around, startled ... He said he was tucking in his shirt, which he could have been. I don't know. I was—I was shocked by it. I just couldn't understand why somebody had to pull their pants down that far to tuck in their shirt." It should be noted, however, that Pansza was the person that reported the incident.

gaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a cause connection between the participation in the protected activity and the adverse employment decision. *Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir.1995); *Mayberry*, 55 F.3d at 1092. To maintain an action for retaliation, an employee need only establish that he had a reasonable belief that discriminatory practices existed. *De Anda v. St. Joseph Hosp.*, 671 F.2d 850, 853 n. 2 (5th Cir.1982). "Once the prima facie case is established, the burden of producing some non-discriminatory reason for its action falls upon the defendant." *EEOC v. J.M. Huber Corp.*, 927 F.2d 1322, 1326 (5th Cir.1991). If the employer meets its burden, the employee then bears the ultimate burden of showing that the reasons given by the employer are a pretext for retaliation. *Id.* To prevail at trial, the employee must demonstrate that his opposition to unlawful activity was a motivating or determinative factor in the adverse employment action taken by her employer, i.e., there must be a causal connection. *Jack v. Texaco Research Ctr.*, 743 F.2d 1129, 1131 (5th Cir.1984); *McMillan v. Rust College, Inc.*, 710 F.2d 1112, 1116 (5th Cir.1983).

▆ Turner has not carried this burden. An individual engages in protected activity under Title VII when the individual has "opposed any practice made an unlawful employment practice ..." by Title VII. *Harvey*, 961 F.Supp. at 1032. In addition, the individual must establish that he had an objectively reasonable belief that the employer's practices were unlawful. *Id.; De Anda*, 671 F.2d at 853 n. 2. Although Turner has asserted his belief that his co-workers took offense to the amount of time he was absent from work, employers are not liable for an employment decision based on the false complaint of an ordinary employee, where the employer reasonably believed the allegation and acted on it in good faith. *Waggoner*, 987 F.2d at 1165–66; *Long v. Eastfield College*, 88 F.3d 300, 306 (5th Cir.1996). Similarly, favoritism is not an unlawful practice under Title VII. *Harvey*, 961 F.Supp. at 1033 (citations omitted).[9] Finally, Turner has not illustrated what protected activity he was engaged in that ultimately led to his termination.[10] His EEOC complaint was not filed until after he had been terminated, and his misconduct is surely not representative of the types of activity intended to be protected by Title VII.

### III. *Conclusion*

There are no outstanding issues of material fact with respect to Turner's claims. It is unfortunate today that many are unwilling to accept their shortcomings or mistakes, and prefer to cloak those failures in the verbiage of discrimination. Turner has failed to provide this Court with anything other than his allegations that his co-workers' complaints were driven by racial animus. Accordingly, CAC's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

---

9. Turner has repeatedly alleged that Pansza, a female, was treated more favorably with regard to absences she incurred in planning a wedding. However, there is no other evidence of systematic discrimination against males, or African–Americans, with regard to the amount of time-off given, save Turner's statements to that effect.

10. Turner's e-mail to Malady on September 1, 1995, regarding his suspicions of racial animus does not rise to the level of protected activity. As CAC correctly points out, in *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir.1989), the 6th Circuit held that a letter from the plaintiff to his supervisor complaining about "ethnocentrism" did not constitute "opposition" for the purposes of retaliatory discharge. Judge Milburn wrote:

> [W]e hold that a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice. An employee may not invoke the protections of the Act by making a vague charge of discrimination. Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination. In our view, such would constitute an intolerable intrusion into the workplace.